AO106 (Rev. 12/03)   Affidavit for Search Warrant

ORIGINAL

# UNITED STATES DISTRICT COURT

SOUTHERN _____ DISTRICT OF   CALIFORNIA

FILED
'07 OCT 31 AM 11: 22
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

3935 TEAK STREET
SAN DIEGO, CA

UNSEALED AS OF 11/6/07
ORDERED SEALED BY COURT

APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT

Case Number: '07 MJ 2573

I,   Special Agent Leslie C. Tomaich _____ being duly sworn depose and say:

I am a(n)   Special Agent for the Drug Enforcement Administration _____ and have reason to believe
                                    Official Title

that   ☐ on the person of or   ☑ on the property or premises known as (name, description and/or location)

See Attachment A.

in the   SOUTHERN _____ District of   CALIFORNIA _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B.

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

Evidence of a crime and property used in committing a crime; contraband, fruits of a crime, and things criminally possessed;
and propery designed or intended for use or which is or has been used as a means of committing a criminal offense.

concerning a violation of Title   21 / 18 _____ United States code, Section(s)   841, 843, 846, 952, 960, 963 / 1956

The facts to support a finding of probable cause are as follows:

See attached Affidavit of Special Agent Leslie C. Tomaich

Continued on the attached sheet and made a part hereof:     ☑ Yes     ☐ No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

October   29 , 2007                    at   San Diego, California
Date                                                        City                                    State

William McCurine, Jr.          U.S. Magistrate Judge          _____
Name of Judge                      Title of Judge                        Signature of Judge

1

2

## ATTACHMENT A

### DESCRIPTION OF PROPERTY TO BE SEARCHED

3      The premises located at 3935 Teak Street, San Diego, California is a single family residence

4  located on the south side of Teak Street.  A photograph of the residence located at 3935 Teak Street, San

5  Diego, California is attached.  3935 Teak Street is a yellow wood building with gray stucco on the side

6  and rear and Spanish tile style roofing. Green and white awnings are also affixed to the house.  The

7  numbers "3935" and "The Santos" are inscribed on a sign on the lamp post visibly located in the front

8  lawn of the house.   A black iron fence surrounds the property.

9      The search shall include all rooms, attics, crawl spaces, safes, briefcases, storage areas,

10  containers, garages, sheds, carports, storage facilities and containers such as safes, vaults, file cabinets,

11  drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, trash cans and vehicles

12  located on or near the premises, that are owned or under the control of the occupants of such premises,

13  evidenced by prior surveillance, possession of keys, maintenance paper work, title, insurance papers,

14  or registration for such vehicles in the name of the occupants including the silver Nissan Sentra bearing

15  California license plate number 4XOB115.

16

17

18

19

20

21

22

23

24

25

26

27

28



1

## ATTACHMENT B

2

### ITEMS TO BE SEIZED

3  1.   Documents containing data reflecting or memorializing the ordering, possession, purchase,
storage, distribution, transportation and sale of controlled substances, including buyer lists, seller
4        lists, pay-owe sheets, records of sales, log books, drug ledgers, personal telephone/address books
containing the names of purchasers and suppliers of controlled substances, electronic organizers,
5        Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage
records, such as storage locker receipts and safety deposit box rental records and key.

6

7  2.   Money, assets, and evidence of assets derived from or used in the purchase of controlled
substances and records thereof, including but not limited to United States currency, negotiable
instruments and financial instruments including stocks and bonds, and deeds to real property,
8        books, receipts, records, bank statements and records, business records, money drafts, money
order and cashiers checks receipts, passbooks, bank checks, safes and records of safety deposit
9        boxes and storage lockers.

10  3.   Weapons, firearms, firearms accessories, body armor, and ammunition and documents relating
to the purchase and/or possession of such items.

11

12  4.   Documents and articles of personal property reflecting the identity of persons occupying,
possessing, residing in, owning, frequenting or controlling the premises to be searched or
property therein, including keys, rental agreements and records, property acquisition records,
13       utility bills and receipts, photographs, answering machine tape recordings, telephone, vehicle
and/or vessel records, canceled mail envelopes, correspondence, financial documents such as
14       tax returns, bank records, safety deposit box records, canceled checks, and other records of
income and expenditure, credit card records, travel documents, personal identification
15       documents and documents relating to obtaining false identification including birth certificates,
drivers license, immigration cards and other forms of identification which the same would use
16       other names and identities other than his or her own.

17  5.   All incoming telephone calls received at the residence during the execution of the search warrant
and all calls received on cellular telephones found during the execution of the warrant.

18

19  6.   Devices used to conduct counter-surveillance against law enforcement, such as radio scanners,
police radios, surveillance cameras and monitors and recording devices and cameras.

20  7.   Photographs and video and audio recordings which document an association with other
coconspirators and/or which display narcotics, firearms, or money and proceeds from narcotics
21       transactions.

22  8.   Police radio scanners, pagers, cellular telephones, facsimile machines, telephone answering
machines, Caller ID system, and prepaid telephone cards.

23

24  9.   Travel documents including itineraries, airline tickets, boarding passes, motel and hotel receipts,
rental car receipts, passports and visas, credit card receipts, shipping and receiving documents
relating to the delivery of packages.

25

26  10.  Banking and financial institution records, bank statements, credit card statements, canceled
checks, money orders, deposit slips, orders for or receipt of money transfer by wire, checking
and saving books, financial institution statements, safe deposit boxes, loan statements, tax
27       returns, business and personal ledgers, and accounting records.

28

11. Records relating to the lease of storage lockers, telephone/address directories and other papers containing telephone numbers and addresses.

12. Records related to the purchase of real estate, vehicles, precious metals, jewelry and other tangible assets.

13. Automotive parts and devices used to create clandestine compartments to hide large quantities of drugs and/or currency.

14. Digital storage devices including: floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magnet optical cartridges, personal digital assistance, pagers, money chips, thumb drives, jump drives, flash drives, portable hard drives and computers containing hard drives. All electronic devices, such as computers, which include the central processing units, internal and external devices, internal and external storage equipment or media, terminals or video display units, together with peripheral equipment, such as keyboards, printers, modems, and programmable telephone dialing devices, and operating system software, program software, applications software, manuals for the software and hardware, electronic organizers, or personal digital assistants and computer discs and CD's, cellular telephones and SIM cards. All seized computers shall be returned to the defendants or the defendant's agent within 10 calendar days. If agents need more time than 10 days to complete the mirror imaging, the Government will seek from the Court an extension of time within which to return the applicable devices and/or equipment.

15. With respect to any and all electronically stored information in cellular phones and PDAs, agents may access, record, and seize the following:

    a. telephone numbers of incoming/outgoing calls stored in the call registry;

    b. Digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    c. Any incoming/outgoing text messages relating to controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960, 963, and money laundering offenses under 18 U.S.C. § 1956;

    d. telephone subscriber information;

    e. the telephone numbers stored in the cellular telephone and/or PDA; and

    f. any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular phone including but not limited to photographs, videos, e-mail, and voice mail relating to controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960, 963, and money laundering offenses under 18 U.S.C. § 1956.

1    <u>**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**</u>

2    **UNITED STATES OF AMERICA**      )
                               )  **SS**

3    **SOUTHERN DISTRICT OF CALIFORNIA**   )

4    I, Leslie C. Tomaich, being duly sworn, declare and state:

5        1.    I make this affidavit in support of an application for a search warrant in furtherance of

6    a narcotics and money laundering investigation conducted by special agents of the United States Drug

7    Enforcement Administration ("DEA") for the premises located at 3935 Teak Street, San Diego,

8    California (hereafter the "target location") described further in Attachment A.

9        2.    The purpose of the search warrant is to seize (1) property that constitutes evidence of tthe

10    commission of controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960, and

11    963, and money laundering offenses under 18 U.S.C. § 1956, (2) contraband, fruits of crime or things

12    otherwise criminally possessed, and (3) property designed or intended for use or which is or has been

13    used as a means of committing a criminal offense.

14        3.    The information contained in this affidavit is based on my own investigation, oral and

15    written reports by other law enforcement officers, physical and electronic surveillance, court-authorized

16    intercepted calls, interviews with sources of information, subpoenaed and public records, vehicle records

17    from the California Department of Motor Vehicles ("DMV"), database checks, searches, phone analysis,

18    and other investigations. Conversations below are set forth in substance unless noted, and most call

19    descriptions are based on summaries prepared by Spanish-speaking monitors, not final transcripts. My

20    interpretations of coded language are set forth in brackets [] and the interpretations are based on multiple

21    sources of information, the context provided from other calls, and agent experience. The dates and

22    times in this affidavit are approximate. Since this affidavit is for a limited purpose, I have not included

23    every fact I know about this investigation.

24

25

26

27

28

# I

## EXPERIENCE AND TRAINING

4.    I am a Special Agent with the DEA and have been so employed since February 1998. I am presently assigned to the San Diego Field Division. I have received 16 weeks of training at the Drug Enforcement Administration Academy located in Quantico, Virginia, where I became familiar with how controlled substances are consumed, manufactured, packaged, marketed and distributed. I have investigated street-level distributors to large-scale organizations, and I have been involved in a number of undercover investigations. I have used many investigative techniques. For example, I have interviewed and operated numerous informants; I have conducted numerous searches, arrests, interviews, and physical and electronic surveillances; and I have participated in money laundering investigations. I have monitored or overheard numerous calls or meetings between informants or undercover agents and drug traffickers. I have also worked and consulted with numerous law enforcement officers experienced in drug investigations. As a result, I am familiar with how drug traffickers speak to each other and generally conduct business. For example, I am aware that drug traffickers discussing criminal matters over the phone often speak in code or vaguely. This training and experience forms the basis for the opinions expressed below.

# II

## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

5.    Through my training, experience, debriefings with numerous drug traffickers, and consultation with other DEA special agents and law enforcement officers, I have learned that:

a.    Individuals involved in drug trafficking maintain documents and other records related to their illicit business at their residence. Specifically, individuals involved in drug trafficking often maintain drug ledgers in order to keep track of their share of proceeds, and the purchasing, storage, distribution, and transportation of drugs. Even after the drugs are sold, documentary records and ledgers are often maintained for long periods of time to memorialize past transactions, record the status of the accounts receivable and accounts payable, and maintain the names, telephone numbers, and contact information for suppliers, customers, and co-conspirators. In my experience, residences and premises

2

1   used by drug traffickers often contain documents and articles of personal property evidencing the

2   identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence

3   and premises.

4              b.     Individuals involved in drug trafficking must often rely on others to obtain their

5   drugs and to help them market the drugs.   Frequently, drug traffickers maintain evidence of the

6   identities of these co-conspirators at their residence.

7              c.     Individuals involved in drug trafficking often store articles of personal property

8   evidencing the identity of persons occupying, possessing, residing  in, owning, frequenting or

9   controlling the premises or property therein.

10             d.     Individuals involved in drug trafficking often take photographs of themselves,

11  their associates, their property, and their controlled substances. Drug traffickers often maintain these

12  photographs at their residences or in their vehicles. Therefore, I am requesting permission to search the

13  residences listed within this warrant and it's attachment(s) for and to seize photographs that law

14  enforcement agents determine to be of evidentiary value.

15             e.     Individuals involved in drug trafficking commonly earn income in the form of

16  cash and try to legitimize these profits.  In order to do this, traffickers frequently attempt to secrete,

17  transfer, and conceal the money by means, including, but not limited to: placing assets in names other

18  than their own to avoid detection while maintaining control; laundering the money through what appears

19  to be legitimate businesses; hiding money in their homes, safes, and safety deposit boxes; or using the

20  money to buy assets which are difficult to trace.  Records of these and other types of transactions are

21  often found at the residences of individuals involved in drug trafficking.

22             f.     Individuals involved in drug trafficking often keep and maintain large amounts

23  of bulk United States currency at their residence. Such funds are often used for everyday expenditures

24  and to maintain and finance their ongoing drug business. Additionally, individuals involved in drug

25  trafficking often amass and maintain assets at their residence which were generated by their drug

26  trafficking activities, or purchased with the cash earned from such drug trafficking.

27

28

3

1          g.     Individuals involved in drug trafficking often maintain weapons, firearms, and

2  ammunition on their persons or in their residence. Such weapons and firearms are used, and can be

3  used, as an instrumentality of the crime of possession and distribution of drugs. Furthermore, I am

4  aware of instances in which drug traffickers have maintained such items in their residences in order to

5  protect themselves and guard their drugs and drug profits, as well as for enforcement purposes during

6  their drug dealings.

7          h.     Individuals involved in drug trafficking use cellular telephones, personal digital

8  assistants (PDAs), and pagers and maintain these items on their person and/or in their residences. Drug

9  traffickers use cell phones, PDAs, and pagers to increase their mobility, coordinate illicit activities, and

10  to provide the drug traffickers with instant access to phone calls and voice messages. The cell phone

11  enables drug dealers to maintain contact with drug associates, drug suppliers, and drug customers.

12  Cellular telephones and PDAs contain wire and electronic data concerning telephonic contact, text

13  messages, and electronic mail messages with co-conspirators, as well as telephone books containing

14  contact information for co-conspirators. Members of drug trafficking and distribution organizations also

15  utilize cell phones and PDAs with photograph and video capabilities to take photographs and videos of

16  other members of drug trafficking and distribution organizations, drugs, money, and assets purchased

17  with drug proceeds. Members of drug trafficking and distribution organizations also utilize cell phones,

18  and PDAs with photograph and video capabilities to take photographs and videos of other members of

19  drug trafficking and distribution organizations, drugs, money, and assets purchased with drug proceeds.

20          i.     Individuals engaging in drug transportation often use computers to communicate

21  with co-conspirators by means of electronic mail ("e-mail"), for the storage of records such as drug

22  transactions, drug proceeds or assets, contact information for co-conspirators, customers, and suppliers,

23  and to maintain digital photographs, and/or audio and video recordings related to drug transactions.

24  Moreover, I know that digital evidence can be stored on a variety of systems and storage devices

25  including: hard disk drives, floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magneto optical

26  cartridges, personal digital assistance, pagers, money chips, thumb drives, flash drives, and portable hard

27

28

4

1   drives. Therefore, I am requesting permission to seize computers, including printers, monitors,

2   keyboards, scanners, and all forms of media storage that may be found at the residence.

3           j.     Individuals involved in drug trafficking often utilize radio scanners, police radios

4   and other electronic equipment in order to conduct counter-surveillance upon law enforcement

5   authorities, and usually maintain these items on their person and/or their residence.

6           k.     Individuals involved in drug trafficking often drive vehicles that are registered

7   in the names of other people and use these vehicles to store and transport narcotics and bulk United

8   States currency.

9       6.     It is also my opinion and belief that the above-described documents and equipment are

10   permanently possessed by drug traffickers much the same way a legitimate business will maintain

11   records and tools of its trade whether or not the business has a particular item in inventory on a given

12   date. These documents and equipment are kept by drug traffickers whether or not the trafficker is in

13   possession of any drugs at any given moment. I believe that the seizure of such documents and

14   equipment will provide evidence of the events set forth in this affidavit and that such documents can be

15   found in the residence despite any lapse of the time between the events described and the anticipated

16   search pursuant to this warrant.

17   **III**

18   **FACTS ESTABLISHING PROBABLE CAUSE**

19       7.     In November 2006, the DEA began investigating the methamphetamine trafficking

20   activities of Eduardo Barajas, Victor Ramos, and their associates. The Barajas/Ramos

21   methamphetamine trafficking group is primarily made up of street gang members, with several members

22   coming from the Shelltown 38th Street Gang, and others with ties to the Mexican Mafia prison gang.

23   During this investigation, DEA special agents obtained court-authorized federal wiretaps for telephones

24   used by Eduardo Barajas and Victor Ramos. Based on intercepted calls, surveillance, and statements

25   by sources of information, the Barajas/Ramos group distributed at least 25 pounds of methamphetamine

26   over a year period. The investigation also revealed that Jacob Tellaeche was an associate of the

27   Barajas/Ramos group.

28

5

1    8.    Jacob Tellaeche, aka "Dopey," is a Shelltown 38th Street gang member. Tellaeche is a

2  United States Citizen who is currently 32 years old. Tellaeche has a 1994 misdemeanor conviction for

3  vandalism.

4  Intercepted Calls and Surveillance

5    9.    As set forth in more detail below, between February 7, 2007 and April 27, 2007, agents

6  intercepted over 50 pertinent telephone calls between Tellaeche and Barajas or others regarding

7  methamphetamine. Agents have also conducted several surveillances involving Tellaeche.

8    10.    On February 13, 2007, agents intercepted several calls Tellaeche and Barajas regarding

9  the quality of methamphetamine that Tellaeche previously stored at his residence. Barajas said that he

10  (Barajas) was going to Tellaeche's residence to check the quality of a pound of methamphetamine that

11  Tellaeche had at his residence. Barajas called Tellaeche and asked if Ramos had been by Tellaeche's

12  residence to check the quality of the methamphetamine. Tellaeche told Barajas that Tellaeche gave

13  Ramos the pound of methamphetamine. Barajas told Tellaeche that Ramos was not supposed to take

14  the methamphetamine, Ramos was only supposed to check the quality of the methamphetamine.

15  Tellaeche told Barajas that Tellaeche would try and get the methamphetamine back from Ramos.

16    11.    On April 14, 2007, agents intercepted a call between Eddie Barajas called Tellaeche

17  regarding cutting or diluting methamphetamine for distribution purposes. Barajas asked how everything

18  was [how the methamphetamine looked]. Tellaeche told Barajas that things [the methamphetamine]

19  looked good. Barajas asked Tellaeche if they were going to be able "to put four into it" [whether four

20  ounces of cut could be added to the methamphetamine for distribution purposes]. Tellaeche said they

21  could. Tellaeche told Barajas that Tellaeche was at his residence. Barajas said that he was on his way

22  to Tellaeche's residence.   Later that day, agents observed Barajas at Tellaeche's residence.

23    12.    On April 18, 2007, agents intercepted several calls between Tellaeche and Barajas

24  regarding a one-pound methamphetamine deal.   Tellaeche told Barajas that Tellaeche could get one

25  pound of methamphetamine, but that Tellaeche's methamphetamine source of supply needed the money

26  up front. Tellaeche told Barajas that he would go to Barajas' residence to pick up the money. Tellaeche

27  told Barajas he would call Barajas as soon as he had received the pound of methamphetamine. Later

28  that day, agents established surveillance at Tellaeche's residence. During the surveillance, Tellaeche

6

1   spotted surveillance. Barajas attempted to contact Tellaeche to inquire if Tellaeche had received the

2   methamphetamine, but Tellaeche did not answer his telephone because Tellaeche had detected agents

3   conducting surveillance. Later that evening, Barajas and Sergio Sanchez went to Tellaeche's residence

4   to retrieve Barajas' money or pick up the methamphetamine. Tellaeche told them to get out of the area,

5   because Tellaeche was being followed by police. At this time, agents have not confirmed whether

6   Tellaeche had the methamphetamine at his residence at the time that Tellaeche detected surveillance.

7   Sources of Information

8         13.    Agents have interviewed multiple sources of information who have corroborated

9   Tellaeche's methamphetamine trafficking activity. The sources of information have criminal histories

10   that include arrests and/or convictions for felony narcotics trafficking offenses, firearm convictions,

11   accessory, misdemeanor offenses, and traffic offenses. Agents have found the information provided by

12   the sources of information to be substantially reliable and corroborated by other information.

13         14.    One source of information (hereafter referred to as "SOI-1") stated that he/she has known

14   had known Tellaeche since approximately 20 years. SOI-1 said Tellaeche is a member of the 'Shelltown

15   38th Street gang. SOI-1 said he/she had purchased methamphetamine from Tellaeche on numerous

16   occasions over the years. SOI-1 also said that he/she had paid $6,500 to Tellaeche for a half pound of

17   methamphetamine a couple of months ago.

18         15.    Another source of information (hereafter referred to as "SOI-2") said that he/she has

19   known Tellaeche for a very long time. SOI-2 said Tellaeche is a member of the Shelltown 38th Street

20   gang. SOI-2 said that Tellaeche purchases cocaine and converts it to crack cocaine, which Tellaeche

21   later distributes.

22         16.    Another source of information (hereafter referred to as "SOI-3") said stated that said

23   he/she had been to Tellaeche's residence on Teak Street seven or eight times. SOI-3 said that, on one

24   occasion, SOI-3 dropped off "horse vitamins", which Tellaeche would use to cut the methamphetamine.

25   SOI-3 said Tellaeche would cut the methamphetamine for Barajas because Barajas did not know how

26   to cut the methamphetamine. SOI-3 said that Ramos would pick the methamphetamine up from

27   Tellaeche as soon as it was cut. SOI-3 said that every time he went to Tellaeche's residence there was

28   a lot of foot traffic at the residence.

7

1    Tellaeche's Connection to the Target Location

2        17.    Throughout this investigation and most recently on October 15, 2007, agents observed

3    Tellaeche at the target location at 3935 Teak Street, San Diego, California.  An inquiry with the

4    California DMV revealed that Tellaeche listed 3935 Teak Street, San Diego, California, as the address

5    of his residence.

6    Vehicle associated with Tellaeche and the Target Location

7        18.    During surveillance, agents have observed Tellaeche driving a silver Nissan Sentra

8    bearing California license plate number 4XOB115.  In addition, this vehicle has been observed at 3935

9    Teak Street on a regular basis.  An inquiry with the California DMV revealed the registered owner to

10   be Maria Juvera of 636 F Street, #9, Chula Vista, California.

11                                    IV.

12                  **SEARCH PROTOCOL FOR COMPUTERS**

13       19.    This section describes the procedures that will be employed during this search to

14   minimize the intrusion represented by the search of any electronic data found at the target location.

15       20.    Searching agents will be asked to use an incremental approach in searching for relevant

16   electronic material.  If the agents are able to examine relevant portions of computer drives to identify

17   responsive material within a reasonable time period on-site, then the agents will attempt to create

18   forensic images of computers or laptops seized.  However, if the agents cannot perform the search

19   within a reasonable period on-site, will they employ alternate procedures to complete the review off-site.

20   In that case, the computer expert will create forensic images of electronic data sources as necessary to

21   complete the search off-site.

22       21.    A forensic image is an exact physical copy of a computer hard drive or other similar

23   electronic storage media.  A forensic image thus captures all of the data on the hard drive (or other

24   media) without the data being viewed and without changing the data in any way. There are many

25   reasons why it is not feasible to conduct a forensic analysis of data on-site.  First, analysis of the data

26   following the creation of the forensic image is a highly technical process that requires specific expertise,

27   equipment and software. Second, there are literally thousands of different hardware items and software

28   programs that can be commercially purchased, installed and custom-configured on a user's computer

                                        8

1  system. Third, it is only after a thorough examination and analysis, that a trained computer forensic

2  examiner can determine whether he needs to obtain specialized hardware or software (not to mention

3  specialized training on the specialized software) in order to view and analyze the data contained in

4  electronic form.

5      22.    The analysis of data on a computer may also be an extremely tedious and time consuming

6  process. In addition, to requiring special technical skills, equipment and software, it may take days to

7  properly search a single hard drive for specific data. With current technology, each search "hit" must

8  be reviewed in its context by an agent to determine whether the data is within the scope of the warrant.

9  In other words, merely finding a good "hit" does not end the review process.

10      23.    Analyzing data on-site has become increasingly impossible as the volume of data stored

11  on a typical computer system has increased. For example, a single gigabyte of storage space (i.e., 1,000

12  megabytes) is the equivalent of 500,000 double-spaced pages of text. Computer hard drives capable of

13  storing 100s of gigabytes of data are becoming quite common in newer desktop computers.

14      24.    In addition to the sheer volume, the data may be stored in a variety of formats or

15  encrypted. The volume of data of course extends the time that it takes to analyze the image in a

16  laboratory. Running keyword searches takes longer and results in more hits that must be individually

17  examined for relevance. Moreover, certain file formats do not lend themselves to keyword searches

18  (e.g., many common electronic mail, database and spreadsheet applications do not store data as

19  searchable text).

20      25.    Based on the foregoing, searching any computer or forensic image for the information

21  subject to seizure pursuant to this warrant may require a range of data analysis techniques and may

22  require off-site analysis.

23      26.    Nevertheless, all forensic analysis of the imaged data will be directed exclusively to the

24  identification and seizure of information within the scope of this warrant. In the course of proper

25  examination, the forensic examiner may view information that is potentially privileged or not within the

26  scope of the warrant. If so, this information will not be made available to the investigating agents unless

27  it appears to the examiner that the information relates to the commission of offenses not covered by this

28

1  warrant. In that event, the examiner will confer with the investigator and/or the prosecuting attorney

2  so that they can determine whether to seek a further search warrant for the newly uncovered data.

3       27.    All seized computers shall be returned to the defendants or the defendant's agent within

4  10 calendar days. If agents need more time than 10 days to complete the mirror imaging, the

5  Government will seek from the Court an extension of time within which to return the applicable devices

6  and/or equipment.

7  **V**

8  **SEARCH PROTOCOL FOR CELLULAR TELEPHONES AND PDAS**

9       28.    With respect to any and all electronically stored information in cellular phones or PDA

10  at the target locations, agents respectfully request that this Court authorize the agents to access, record,

11  and seize the following:

12           a.    telephone numbers of incoming/outgoing calls stored in the call registry;

13           b.    Digital, cellular, and/or telephone numbers and/or direct connect numbers,

14  names and identities stored in the directories;

15           c.    Any incoming/outgoing text messages regarding violations of 21 U.S.C. §§

16  841(a)(1), 843(b), 846, 952, 960, 963, and/or 18 U.S.C. § 1956;

17           d.    telephone subscriber information;

18           e.    the stored telephone numbers dialed from the cell phone and/or PDA; and

19           f.    any other electronic information in the stored memory and/or accessed by the

20  active electronic features of the digital or cellular phone including but not limited to photographs,

21  videos, e-mail, and voice mail regarding violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960,

22  963, and/or 18 U.S.C. § 1956;.

23       29.    If the agents cannot analyze the cellular telephone or PDA on site, they may send the

24  cellular telephone or PDA to the Regional Crime Forensic Lab (RCFL) or the DEA Digital Lab to all

25  analysts or forensic examiners to examine, analyze, and make a record of the contents of the information

26  stored in the seized cellular telephone or PDA.

27

28

10

## VI

## CONCLUSION AND SEALING REQUEST

30.    Based on my training and experience, consultation with other special agents and law enforcement officers, and all of the facts and opinions set forth in this affidavit, there is probable cause to believe that federal crimes have been committed, including controlled substances violations under 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960, 963, and money laundering violations under 18 U.S.C. § 1956.   There is also probable cause to believe that property constituting evidence of the offenses, contraband, fruits of crime or things otherwise criminally possessed, and property designed or intended for use or which is or has been used as a means of committing the criminal offenses will be found in the target location described further in Attachment A.

31.    Because this is an ongoing investigation and premature disclosure of the investigation could endanger agents and officers, cause the target subjects and others to flee and cause destruction of evidence, I request that this affidavit, the application for the search warrant, the search warrant, and all other associated court records be sealed until further court ordered.

I declare under penalty of perjury that the foregoing is true and correct.


LESLIE C. TOMAICH
Special Agent
Drug Enforcement Administration


Sworn to and subscribed before me
this _____ day of October, 2007.


HONORABLE WILLIAM MCCURINE, JR.
United States Magistrate Judge

11